**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 13-cv-02586-CMA-CBS

GUADALUPE SANCHEZ-PENUNURI,

      Petitioner,

v.

JOHN LONGSHORE, Field Director, Immigration and Customs Enforcement,
JEH JOHNSON, Secretary of the Department of Homeland Security,
JOHN MORTON, Director for Immigration and Customs Enforcement,
ERIC HOLDER, Attorney General, United States of America, and

      Respondents.

---

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

---

This matter is before the Court on Petitioner Guadalupe Sanchez-Penunuri's

petition for a writ of habeas corpus.  (Doc. # 1.)  For the reasons stated below, the Court

grants Mr. Sanchez-Penunuri's petition.

## I. BACKGROUND

Mr. Sanchez-Penunuri is a native and citizen of Mexico who first entered the

United States in 1985 and obtained legal permanent residency in 1990.  In 2003, Mr.

Sanchez-Penunuri pleaded guilty to two felony violations of Colorado laws banning the

possession and distribution of controlled substances.  He was sentenced to a three-year

term of probation, a fine, and community service, all of which he completed by 2007.

On August 27, 2013, Mr. Sanchez-Penunuri was arrested by Immigration and Customs

Enforcement and has been detained at the GEO Detention Facility in Aurora, Colorado, since that date.  (Doc #1 at 5-6.)

This case concerns Mr. Sanchez-Penunuri's access to a bond hearing, which in the immigration context is governed by 8 U.S.C. § 1226(a).  Certain classes of immigrants are not entitled to a § 1226(a) bond hearing because they are subject to mandatory detention pursuant to 8 U.S.C. § 1226(c).  Mr. Sanchez-Penunuri asked an Immigration Judge (IJ) to conduct a bond hearing in accord with § 1226(a).  The IJ, however, rejected this request, reasoning that Mr. Sanchez-Penunuri was subject to mandatory detention under § 1226(c).  (Doc. # 1-1.)  The IJ was required to deny Mr. Sanchez-Penunuri's bond hearing request because he was bound by *Matter of Rojas*, 23 I. & N. Dec. 117 (BIA 2001), a precedential decision from the Board of Immigration Appeals (BIA), which broadly interprets § 1226(c) to include noncitizens[1] such as Mr. Sanchez-Penunuri.

Mr. Sanchez-Penunuri argues he is entitled to a bond hearing because the BIA's interpretation of § 1226(c) is erroneous and the conditions dictating mandatory detention in § 1226(c) do not apply to him.  In the alternative, he argues that the statute as applied violates his constitutional rights.  The government disagrees, arguing that § 1226(c) requires mandatory detention for Mr. Sanchez-Penunuri and that no constitutional violation arises from his detention.

---

[1]  The government refers to Mr. Sanchez-Penunuri as a criminal alien or an alien.  (Doc. # 11, at 2-3.)  But the Supreme Court has used the term "noncitizen" to refer to immigrants such as Mr. Sanchez-Penunuri.  *See, e.g.*, *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1678 (2013).  This Court adheres to the convention used by the Supreme Court, unless referencing an authority that uses a different term.

## II. LAW AND ANALYSIS

This Court must resolve several issues in the present case.  First, in light of an argument raised by the government in its response to Mr. Sanchez-Penunuri's habeas petition, this Court must determine if Mr. Sanchez-Penunuri has named a proper respondent for the petition, such that this Court can reach the merits of his claims. Second, this Court must consider the parties' competing interpretations of § 1226(c) and determine whether the statute applies to Mr. Sanchez-Penunuri.  Third, if the statute does apply to Mr. Sanchez-Penunuri, this Court must reach Mr. Sanchez-Penunuri's alternative argument that the statute as applied violates his constitutional rights.

This Court concludes that Mr. Sanchez-Penunuri has named a proper respondent and that it can therefore consider the merits of Mr. Sanchez-Penunuri's claims.  Further, on the merits, this Court substantially agrees with Mr. Sanchez-Penunuri's interpretation of § 1226(c) and, in line with the majority of federal courts to have addressed this issue,[2] concludes that § 1226(c) does not apply to Mr. Sanchez-Penunuri.  Thus, this Court concludes that Mr. Sanchez-Penunuri is entitled to a bond hearing under § 1226(a).  Because the language of the statute dictates this result, this Court declines to reach Mr. Sanchez-Penunuri's constitutional challenge.

---

[2]  Other courts have collected authorities documenting the emerging split of authority over the correct interpretation of § 1226(c), in which a majority of courts have adhered to the interpretation of § 1226(c) that this Court endorses here.  *See Baquera v. Longshore*, No. 13-CV-00543-RM-MEH, 2013 WL 2423178, *4 & n.3 (D. Colo. June 4, 2013) (collecting cases); *Dighero-Castaneda v. Napolitano*, No. 2:12-CV-2367-DAD, 2013 WL 1091230, *6-7 (E.D. Cal. Mar. 15, 2013) (same).

### A. IMMEDIATE CUSTODIAN RULE

1. Introduction

Before reaching the merits, this Court must address the threshold question of whether Mr. Sanchez-Penunuri has named a proper respondent in his habeas petition. Mr. Sanchez-Penunuri brought his petition under 28 U.S.C. § 2241(c)(3), which extends habeas relief to persons "in custody under or by color of the authority of the United States," 28 U.S.C. § 2241(c)(1), and to those "in custody in violation of the Constitution or laws or treaties of the United States," *id.* § 2241(c)(3).  (Doc. # 1, at 3.)  There is no dispute that Mr. Sanchez-Penunuri's petition satisfies the "in custody" requirements of § 2241 or that this Court has subject matter jurisdiction pursuant to this statute.[3]

Rather, the dispute arises over who can grant Mr. Sanchez-Penunuri the relief he requests.  Mr. Sanchez-Penunuri originally named four respondents in his petition: the Attorney General, the Secretary of the Department of Homeland Security,[4] the Director of ICE, and the Field Director of Denver's ICE Office.  He alleges these respondents can provide the type of relief he requests: "an individualized bond hearing before an Immigration Judge."  (Doc. # 1, at 22.)

The government disagrees.  Citing *Rumsfeld v. Padilla*, 542 U.S. 426 (2004), the government argues that none of these individuals are proper respondents for a habeas petition based on a challenge to immigration detention.

---

[3] Mr. Sanchez-Penunuri references a number of other fonts of subject matter jurisdiction, but this Court is satisfied that § 2241 provides such jurisdiction over this case.

[4] Mr. Sanchez-Penunuri originally named as a respondent Janet Napolitano, who is now the *former* DHS Secretary.  This Court automatically substitutes the new DHS Secretary, Jeh C. Johnson, for former Secretary Napolitano.  *See* Fed. R. Civ. P. 25(d).

Similar to this case, *Padilla* concerned a habeas petition filed under 28 U.S.C. § 2241 by Jose Padilla, a United States citizen detained as an "enemy combatant" and suspected member of Al Qaeda, pursuant to the Authorization for Use of Military Force Joint Resolution, Pub. L. 107-40, 115 Stat. 224.  At the time he filed his habeas petition, Mr. Padilla—who was then detained in the Consolidated Naval Brig in Charleston, South Carolina—named the Secretary of Defense as the respondent to his petition. The lower courts agreed that naming the Secretary was proper, rationalizing that although the warden of the naval brig exercised control over Mr. Padilla's day-to-day activities, the Secretary maintained the legal reality of control.  *Padilla*, 542 U.S. at 433.

The Supreme Court disagreed, concluding that the "immediate custodian rule" applied to Mr. Padilla's petition.  The Court traced the origin of this rule to *Wales v. Whitney*, 114 U.S. 564, 574 (1885), which held that the habeas statute "contemplate[s] a proceeding against some person who has the *immediate custody* of the party detained, with the power to produce the body of such party before the court or judge, that he may be liberated if no sufficient reason is shown to the contrary." *Padilla*, 542 U.S. at 435 (quoting *Wales*, 114 U.S. at 574 (emphasis supplied by the *Padilla* Court)).

Further, the *Padilla* Court continued, "in accord with the statutory language and *Wales*' immediate custodian rule, longstanding practice confirms that in habeas challenges to present physical confinement-'core challenges'-the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." *Padilla*, 542 U.S. at 435. Rather than the Secretary of Defense, the Court concluded that the commander of the

brig in South Carolina—Mr. Padilla's immediate custodian—was the only proper respondent. *Id.* at 436.

The government invokes this "core challenge" language from *Padilla* and argues the immediate custodian rule applies here. Thus, the government concludes that "[a]ll of the named individuals are remote supervisory officials, and all are therefore improperly named and should be dismissed from this Petition." (Doc. # 11, at 1 n.1.) At the same time, the government alleges that Mr. Sanchez-Penunuri is "detained at the Denver Contract Detention Facility, and the warden of that facility is Johnny Choate, who is therefore the proper respondent to this Petition." (*Id.*) Mr. Sanchez-Penunuri disputes that Mr. Choate is the proper respondent and maintains that the local Field Office Director for Immigration and Customs Enforcement is the only proper respondent. (Doc. # 12, at 1 n.1.)

Resolving this dispute between the parties actually involves answering two separate questions. First, the Court must determine if the immediate custodian rule applies to Mr. Sanchez-Penunuri's petition. Second, if the rule does not apply, this Court must determine who is a proper respondent.

This Court concludes first that the immediate custodian rule does *not* apply to Mr. Sanchez-Penunuri's type of challenge to detention. Second, this Court finds that at least two of the originally named respondents—the Attorney General and DHS Secretary—are properly named. Third, however, out of an abundance of caution and for the reasons stated below, this Court declines to dismiss any respondent from this case.

2.  *Padilla* Exception for Immigration Detention

As an initial matter, this Court notes that the government's basis for demanding that the other named respondents be dismissed is entirely contained within one relatively short footnote at the beginning of the government's response to Mr. Sanchez-Penunuri's petition.  (Doc. # 11, at 1 n.1.)  This Court views what is a borderline conclusory argument as insufficient, especially because the government *fails* to alert the Court to adverse authority contained in *Padilla* itself that might dictate a different result.[5]

In particular, the government inexplicably *ignores* a footnote appended to the language it references from *Padilla*, which in fact *qualifies* the *Padilla* holding by stating that the Court has "left open the question whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation."  *Padilla*, 542 U.S. at 435 n.8.  This same footnote in *Padilla* references (but declines to weigh in on) a circuit split on whether the immediate custodian rule applies in the immigration detention context.  *See also id.* at 458 (Stevens, J., dissenting) ("All Members of this Court agree that the immediate custodian rule should control in the ordinary case . . . . But we also all agree . . . that special circumstances can justify exceptions from the general rule."  (internal quotation marks omitted)).

---

[5]  Although attorneys appearing before this Court need disclose only binding authority that is directly adverse, *see* Colo. R. Prof. Cond. 3.3(a)(2), as this Court's review of the relevant case law reveals, this is hardly the first time the Department of Justice has litigated the application of the immediate custodian rule in the immigration detention context.  In light of the extensive discussion of this complicated question by a number of courts outside the Tenth Circuit, this Court finds the government's omission of *all* adverse authority—and its summary treatment of the immediate custodian question itself—at the least, concerning.

The Tenth Circuit has yet to weigh in on the circuit split identified in *Padilla*.[6] Thus, deciding what appears to be an issue of first impression in this circuit, this Court first concludes that the immediate custodian rule does *not* apply in the immigration detention context, at least under the unique circumstances of this case.  In reaching this conclusion, this Court is guided in part by reasoning of the Ninth Circuit in *Armentero v. INS*, 340 F.3d 1058, 1059-60 (9th Cir. 2003) (*Armentero I*), *reh'g granted*, *opinion withdrawn*, 382 F.3d 1153 (9th Cir. 2004), *opinion after grant of reh'g*, 412 F.3d 1088 (9th Cir. 2005) (*Armentero II*), which this Court reviews in detail below.

     3.  *Armentero I*

*Armentero I*, which was decided about a year before *Padilla* and is referenced in the aforementioned *Padilla* footnote, concerned a habeas challenge to immigration detention brought by Luis Armentero, a Cuban national.  Although Mr. Armentero was found removable from the United States, immigration authorities could not return him to Cuba.  The Immigration and Naturalization Service (INS) nevertheless kept him detained, with no apparent plan to release him.  Mr. Armentero challenged this

---

[6] In several unpublished opinions unrelated to immigration detention, the Tenth Circuit has referenced or relied upon *Padilla*'s immediate custodian rule.  *See DeWilliams v. Davis*, 369 F. App'x 912, 915 (10th Cir. 2010) (holding that the rule bars naming the Chairman of the United States Parole Commission as the respondent to a federal prisoner's habeas petition); *Allen v. Briggs*, 331 F. App'x 603, 606 (10th Cir. 2009); *Flynn v. Kansas*, 299 F. App'x 809, 811 n.3 (10th Cir. 2008) (noting that the rule can be waived).  The same is true for district courts within the circuit, though one court has noted (but declined to weigh in on) the question in the immigration detention context.  *See, e.g.*, *McGinn v. People of Colorado*, No. 10-CV-01511-BNB, 2010 WL 4318564, at *1 (D. Colo. Oct. 25, 2010); *Okero v. Gonzales*, No. CIV-07-224-W, 2007 WL 2080170, at *1 (W.D. Okla. July 18, 2007) (noting the split of authority on the question but declining to reach the issue).

detention on constitutional grounds and named the INS as the sole respondent in a habeas petition brought under 28 U.S.C. § 2241.

The Ninth Circuit declined to reach the merits of Mr. Armentero's petition, finding that the INS was an improper respondent.  Ultimately, after reviewing prior Supreme Court and lower-court precedent on the matter, the Ninth Circuit concluded "while a petitioner's immediate physical custodian is typically a proper respondent in traditional habeas petitions, the statutory custodian requirement of 28 U.S.C. § 2241 is sufficiently flexible to permit the naming of respondents who are not immediate physical custodians if practicality, efficiency, and the interests of justice so demand." *Id.* at 1068.

The Ninth Circuit reached this conclusion in part because of the distinctive nature of immigration detention which, as the court explained, is often outsourced to state, local, and even private facilities.  As the Ninth Circuit reasoned, when immigration detainees are housed in such non-federal facilities, "a writ directed to the warden of the institution would make little legal sense, as the wardens' control over immigration detainees in their institutions results from their limited contractual arrangements with federal authorities." *Id.*[7]

---

[7]  The Ninth Circuit also reasoned that a rule tying an immigration detainee to the warden of his detention facility made less sense because of the immigration authorities' well-documented policy of moving such detainees around the country, often to remote locations with limited access to legal resources.  Considering this problem, the *Armentero I* court reasoned that if the immediate custodian rule applied, "[b]y the time a district court judge is able to consider a habeas petition filed in her court, the petitioner may already have been moved out of the court's territorial jurisdiction, thereby necessitating time-consuming transfer or dismissal of the petition." *Id.* at 1069.  The *Padilla* Court somewhat addressed this concern by noting an exception to the immediate custodian rule.  *See Padilla*, 542 U.S. at 441 ("[W]hen the [g]overnment moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release.").

Having concluded that the immediate custodian rule did not apply, the Ninth Circuit endeavored to identify the proper custodian under the unique facts of Mr. Armentero's case.  *Id.* at 1068.  Importantly, at the time *Armentero I* was decided, the government *agreed* with the Ninth Circuit that the immediate custodian rule should not apply: rather than identifying the warden of an INS detention facility as a proper respondent, the government advanced the position that the appropriate respondent was the "Bureau of Immigration and Customs Enforcement Interim District Director for the region in which a petitioner is detained."  *Id.* at 1071; *see also id.* ("Notably, *neither* party proposes that the warden of the facility in which Armentero is detained is the appropriate respondent."  (emphasis in original)).[8]

The Ninth Circuit disagreed with the government as to the identity of the correct respondent, concluding that both the Attorney General and the Secretary of DHS were the proper respondents for Mr. Armentero's petition.  *Id.* at 1071.  In support of this position, the Ninth Circuit relied on a number of statutory authorities, along with regulations and legal memos issued by both the Department of Justice and the Department of Homeland Security (DHS), which suggested that the heads of both of these federal departments exercised control over different aspects of Mr. Armentero's detention.

Because DHS had only recently been created, the *Armentero I* court could not determine which of these two department heads exercised more control over the

---

[8]  Although irrelevant for purposes of this case, Mr. Armentero continued to argue that the INS itself was the proper respondent.  *Armentero I*, 340 F.3d at 1071.

detainee or if one department exercised exclusive control.  The court concluded "[u]ntil

the exact parameters of the Attorney General's power to detain noncitizens under the

new Homeland Security scheme are decisively delineated, we believe it makes sense

for immigration habeas petitioners to name the Attorney General *in addition* to naming

the DHS Secretary as respondents in their habeas petitions." *Id.* at 1073 (emphasis in

original).  The Ninth Circuit remanded the case with instructions that these government

officials be added as respondents.  *Id.* at 1074.

        4. *Armentero II*

      The Supreme Court's decision in *Padilla* prompted the *Armentero I* panel to grant

a petition to rehear the case.[9]  However, at some point during the litigation, Mr.

Armentero apparently absconded from the facility where he had been detained.  In light

of this development, a two-judge majority on the *Armentero I* panel vacated the original

decision in accord with the "fugitive disentitlement" doctrine.  *Armentero II*, 412 F.3d

1088 (9th Cir. 2005).

      Judge Berzon, however, disagreed with the two-judge majority that the fugitive

disentitlement doctrine applied.  In dissent, she explained how she would have resolved

the merits of the question to be addressed on rehearing: namely, the application of the

immediate custodian rule in light of *Padilla.  See Armentero II*, 412 F.3d 1088, 1088-

---

[9]  *Padilla* is in tension with some aspects of *Armentero I*, such as *Armentero I* court's position
that the immediate custodian rule is sufficiently "flexible to permit the naming of respondents
who are not immediate physical custodians if practicality, efficiency, and the interests of justice
so demand."  *Armentero I*, 340 F.3d at 1068; s*ee also supra* note 7*.*

1091 (9th Cir. 2005) (Berzon, J., dissenting).  This analysis is instructive to the issue to

be decided here.

In addressing the merits, Judge Berzon first noted how the government's position

had changed in light of *Padilla*:

> The government did not argue in *Armentero I* that the immediate
> custodian *was* the proper respondent.  Rather, it argued that the proper
> respondent was the [INS] District Director (now the [ICE] "Field Office
> Director")—the supervisor of the local office of the then-INS.  Moreover,
> the government argued then, and continues to suggest now, that, so long
> as a detainee files his habeas petition in the district of confinement, the
> immediate custodian rule need not apply.  In such a case, the government
> purports to "waive" whether the proper respondent is the Field Office
> Director or a subordinate, so long as it is no one *superior* to the Field
> Office Director.

*Armentero II*, 412 F.3d at 1096 (footnote omitted; emphasis in original).  In other words,

there was virtually no material difference between the government's position in

*Armentero I* and *Armentero II*: in both cases the government advocated that the

immediate custodian rule did not apply and that a local official, the ICE Field Office

Director (ICE FOD), was the proper respondent.  *See also Campbell v. Ganter*, 353 F.

Supp. 2d 332 (E.D.N.Y. 2004) (adhering to this same position, post-*Padilla*).

Nevertheless, Judge Berzon disagreed with the government, reasoning that a

local official such as an ICE FOD could not serve as a proper respondent.  She began

by suggesting the *Padilla* decision itself misapplied *Wales*, which, as mentioned above,

was the main case the Supreme Court relied upon in articulating the immediate

custodian rule.  Quoting an opinion from another district court, Judge Berzon noted:

> We often think of habeas corpus as the remedy the prisoner seeks, i.e.,
> that if the prisoner is entitled to relief, the court will issue a writ of habeas
> corpus, which will end his imprisonment.  But as the older statutes show,

> the writ of habeas corpus merely initiates the proceedings.  It is analogous
> in this respect to the writ of certiorari, another prerogative writ still in use.
> When the Supreme Court grants a writ of certiorari, it is bringing the case
> before it for decision rather than deciding it on the merits.  The same is
> true in the case of habeas corpus.

*Armentero II*, 412 F.3d at 1097 (quoting *Roman v. Ashcroft*, 162 F. Supp. 2d 755, 759

(N.D. Ohio 2001)).

Drawing on this analogy between the habeas writ and the certiorari writ, Judge

Berzon noted that "[a]t the time of *Wales*," naming the immediate custodian "was a

practical necessity" because that person was "best suited physically to bring the

prisoner before the court, regardless of his authority to effectuate the prisoner's

*release*." *Id.* (emphasis in original).  The need to require the prisoner's presence on the

habeas writ, however, was obviated by the growing practice adopted by habeas courts

of requiring show-cause proceedings before issuing the writ.  *Id.*  This practice,

endorsed unanimously by the Supreme Court in *Walker v. Johnston*, 312 U.S. 275

(1941), is now codified in 28 U.S.C. § 2243, the statute that governs the issuance of the

writ.  *Armentero II*, 412 F.3d at 1097.[10]

In light of this precedent and history, Judge Berzon concluded that the *Wales*

Court's version of the "immediate custodian rule" was based on "what is today a legal

anachronism: that the petitioner is actually to be brought before the court."  *Id.* at 1098.

In other words, before *Walker*, there existed a perceived requirement to use the habeas

---

[10]   *See also* Megan A. Ferstenfeld-Torres, *Who Are We To Name? The Applicability of the
"Immediate-Custodian-As-Respondent" Rule to Alien Habeas Claims Under 28 U.S.C. § 2241*,
17 Geo. Immigr. L.J. 431, 462 (2003) ("Although initially underutilized, orders to show cause are
now 'part and parcel' of habeas practice, and are explicitly authorized by 28 U.S.C. § 2243."
(footnotes omitted)).

writ as a necessary trigger for determining the merits of a habeas petition: just as the Supreme Court cannot decide a case without granting the certiorari writ, so too was a court unable to decide a habeas case without granting the habeas writ and having the presence of the "corpus" at the proceeding on the merits.

But in light of *Walker* and the codification of the show-cause rule in § 2243, Judge Berzon advocated that "[t]oday . . . the more central question raised in a habeas petition is whether the respondent has the authority to effectuate the petitioner's release." *Id.* Thus, reasoned Judge Berzon, the exceptions to the immediate custodian rule, such as those referenced in the aforementioned *Padilla* footnote, were driven by "practical considerations," in order to avoid naming a respondent with no real power to effectuate release. *Id.*[11]

Having charted the contours of the immediate custodian rule, its exceptions, and the reasoning that drives the exceptions, Judge Berzon applied this reasoning to the facts of the petitioner's case. After a review of the specific statutes and rules authorizing and regulating detention for noncitizens such as Mr. Armentero, Judge Berzon concluded that no local official, such as an ICE FOD, could authorize his

---

[11]  The *Padilla* Court did not consider Judge Berzon's position that the immediate custodian rule is a relic of a bygone era, where it made practical sense to issue the writ to a warden.  Further, Judge Berzon's contention that the "more central question" in naming a proper habeas respondent turns on whether he "has the authority to effectuate the petitioner's release" at first blush seems in tension with the holding of *Padilla*, where the official the Court identified as the proper respondent—the commander of the brig where the petitioner was detained—presumably had no "authority to effectuate" Padilla's release, absent direction from his superiors.  Yet Judge Berzon's position is not in tension with *Padilla*.  Rather, Judge Berzon's most useful insight in *Armentero II* was her suggestion that *the exceptions* to the immediate custodian rule, such as those that may exist in the immigration detention context, derive from concerns about practical considerations, often related to the identity of the person with authority to effectuate a petitioner's release.

release. Rather, Judge Berzon concluded that the correct respondent must be an official superior to the local ICE official because only such a person would have the authority to effectuate release, under regulations relevant to the unique circumstances of Mr. Armentero's case. *Id.* at 1099-102.

> 5. The Immediate Custodian Rule and Immigration Detainee Access to Discretionary Relief

Since *Armentero II*, the government has apparently reconsidered its position on the application of the immediate custodian rule in immigration detention cases. Whereas in *Armentero II* (and *Armentero I*) the government argued that the immediate custodian rule *did not* apply and a local ICE FOD was a proper respondent, now the government suggests that the rule *does* apply and the ICE FOD is an improper party. Indeed, the government's newfound eagerness to raise challenges about proper habeas respondents appears to be about six months old: in *Baquera v. Longshore*, No. 13-CV-00543-RM-MEH, 2013 WL 2423178 (D. Colo. June 4, 2013), a habeas challenge with the same claims as those at issue here, the government raised no argument about the propriety of naming the exact same officials as those identified by Mr. Sanchez-Penunuri.[12]

---

[12] This Court can take judicial notice of the records contained in the *Baquera* docket. *See* Fed. R. Evid. 201(b)(2). This Court also notes that in post-*Padilla* challenges to detention under § 1226(c), the government has pursued a seemingly haphazard policy of selectively invoking the immediate custodian rule in cases where the petitioner named at least some of the same respondents as those named here. *Compare, e.g., Hosh v. Lucero*, 680 F.3d 375 (4th Cir. 2012) (immediate custodian rule not raised, though petitioner did not name his immediate custodian); *Sylvain v. Attorney Gen. of U.S.*, 714 F.3d 150 (3d Cir. 2013) (rule not raised, though immediate custodian was named in addition to other respondents), *with Bourguignon v. MacDonald*, 667 F. Supp. 2d 175 (D. Mass. 2009) (noting that the government invoked the rule); *Bogarin-Flores v. Napolitano*, No. 12-CV-0399 JAH WMC, 2012 WL 3283287 (S.D. Cal. Aug. 10, 2012) (same); *see also Armentero II*, 412 F.3d at 1102 n.12 (noting that at rehearing oral

Further, the government's novel position on this question appears in tension with the relevant regulations interpreting § 1226(c).  These regulations authorize the ICE District Director, not the immediate custodian, to exercise his or her discretionary judgment to release noncitizens whose prolonged detention might violate the Constitution.  *See* 8 C.F.R. § 1236.1(c)(6)(i); *id.* § 1236.1(c)(6)(ii).

In fact, apart from an immigration judge, the ICE District Director is the only official who appears authorized by regulation to make custody decisions for immigration detainees.  Further, this Court finds no regulation identifying the warden of an immigration detention facility as the person with authority to release a detainee.  Perhaps this is because, as the *Armentero I* court observed, ICE often outsources detention to state, local, or private facilities and therefore endowing such an official with this authority "would make little legal sense, as the wardens' control over immigration detainees . . . results from their limited contractual arrangements with federal authorities."  340 F.3d at 1061.

At the same time, novelty and inconsistency are not enough to defeat the government's argument.  Thus, this Court must determine whether the immediate custodian rule applies to Mr. Sanchez-Penunuri's challenge to his immigration detention.

This Court begins its analysis by noting an important distinction between the relief requested in *Padilla* and the relief requested in the instant case.  Whereas Mr.

argument, the government represented that it is "currently undertaking an internal review of its procedures to determine the appropriate official to name as the respondent in immigration habeas petitions, if not the immediate custodian").

Padilla sought immediate release from custody, Mr. Sanchez-Penunuri's principal request is that this Court direct an IJ to conduct a bond hearing in accord with 8 U.S.C. § 1226(a), which hearing might result in his release.  (Doc. # 1, at 22.)

Mr. Sanchez-Penunuri's use of habeas to challenge the government's interpretation of how it exercises its discretion is grounded in a long tradition of habeas challenges raised by immigration detainees.  The tradition emerged from early litigation over immigration authorities' overly broad reading of statutes excluding classes of noncitizens who were detained upon arrival at United States ports of entry or detained for deportation.  The Supreme Court curbed this practice in *Gegiow v. Uhl*, 239 U.S. 3 (1915), in which the Court established that "when the record shows that a commissioner of immigration is exceeding his power, the alien may demand his *release upon habeas corpus*."  *Id.* at 9; *see also* Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 Colum. L. Rev. 961, 1015 (1998) ("The Supreme Court's decision in *Gegiow v. Uhl* illustrates . . . the importance of habeas for keeping immigration officials within the bounds of their statutory authority.").

Further, the Supreme Court expanded an immigrant's access to habeas relief in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), which concerned a statute permitting immigration authorities to accord discretionary relief from an order of deportation.  Similar to Mr. Sanchez-Penunuri, the habeas petitioner in *Accardi* sought to avail himself of this discretionary relief, but the request was denied by an immigration hearing officer and by the BIA.  *Id.* at 262-63.  In response, the petitioner brought a habeas petition naming the Attorney General as a respondent and alleging that around

the time when he sought discretionary relief from the BIA, the Attorney General had created a list of "unsavory characters" that the Attorney General stated he wanted to deport.  The petitioner further alleged that the Attorney General circulated this list "among all employees in the Immigration Service and on the [BIA]."  *Id.* at 264. Because the petitioner's name was on this list, he alleged that the Attorney General's actions "amounted to public prejudgment . . . so that fair consideration of petitioner's case by the Board of Immigration Appeals was made impossible."  *Id.*

The Supreme Court concluded that, if the petitioner's allegations were true, they demonstrated that the Board's discretion had been compromised and it would have failed to exercise the discretion it was authorized to use by statute.  As the Court reasoned: "[i]f petitioner can prove the allegation [in a hearing on his habeas petition] he should receive a new hearing before the Board without the burden of previous proscription by the list."  *Id. at* 268.  At the same time, the Court found it "important to emphasize that we are not here reviewing and reversing the manner in which discretion was exercised . . . . [but rather] the Board's alleged failure to exercise its own discretion . . ."  *Id.*

The *Accardi* holding was reaffirmed in another immigration case, *INS v. St. Cyr*, 533 U.S. 289 (2001).  *St. Cyr* also involved an immigrant's challenge through habeas of the "Attorney General['s]" failure to consider affording him discretionary relief from deportation.  *Id.* at 324.

In considering this challenge, the *St. Cyr* Court reasoned that the petitioner's claim was actionable in habeas because "[h]abeas courts . . . regularly answered

questions of law that arose in the context of discretionary relief." *Id.* at 307  Like the

*Accardi* Court, the *St. Cyr* Court also noted that these courts must "recognize a

distinction between eligibility for discretionary relief, on the one hand, and the favorable

exercise of discretion, on the other hand." *Id.*

The Supreme Court rooted this reasoning in prior immigration habeas

jurisprudence, including *Gegiow* and *Accardi*, and in academic literature on the subject.

As the Court reasoned, "[i]n case after case, courts answered questions of law in

habeas corpus proceedings brought by aliens challenging Executive interpretations of

the immigration laws." *Id.* at 306-07 (footnote omitted).  Thus, the Court concluded that

"[t]he exercise of the District Court's habeas corpus jurisdiction to answer a pure

question of law" regarding access to discretionary relief "is entirely consistent with the

exercise of such jurisdiction in *Accardi*." *Id.* at 308.[13]

While habeas corpus is traditionally used to direct release from the jailer, *Accardi*

and *St. Cyr* demonstrate that the historical development of the doctrine in the

immigration detention context has charted a different course.  Rather than a remedy to

---

[13]  Habeas is not the only vehicle to challenge an agency's failure to consider exercising discretion. Mandamus relief may also be available. *See, e.g.*, *ICC v. U.S. ex rel. Humboldt S.S. Co.*, 224 U.S. 474, 483-84 (1912) (affirming an appellate court's issuance of a writ of mandamus for the Interstate Commerce Commission to perform a discretionary function); *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 218 & n.7 (1930) (noting that mandamus relief "is employed to compel action, when refused, in matters involving judgment and discretion, but not to direct the exercise of judgment or discretion in a particular way nor to direct the retraction or reversal of action already taken in the exercise of either" and collecting further authorities in support of this position); *Samirah v. Holder*, 627 F.3d 652 (7th Cir. 2010) (authorizing mandamus relief to require the Attorney General to consider exercising discretion for a petitioner who was located outside the United States and, pursuant to *Boumediene v. Bush*, 553 U.S. 723 (2008), therefore unable to advance his petition through habeas).  But this Court sees no reason to doubt that habeas relief is the appropriate vehicle for Mr. Sanchez-Penunuri's challenge.

accord immediate release for a detainee, in the immigration context, habeas is often a vehicle used to afford an immigrant access to consideration for discretionary relief. Given this unique development in the immigration detention context, "practical considerations," *Armentero II*, 412 F.3d at 1098, dictate that this Court not mechanically apply the immediate custodian rule in Mr. Sanchez-Penunuri's case.

Such practical considerations also inform this Court's conclusion that the immediate custodian rule cannot apply to Mr. Sanchez-Penunuri's habeas challenge. Indeed, even if the respondents in *Accardi* and *St. Cyr* were in custody,[14] applying the immediate custodian rule in these cases would have yielded an impractical result. It would have made no sense to ask a warden of an immigration detention facility to provide the relief they requested: a jailer has never been recognized as possessing the authority to consider granting an immigrant some sort of discretionary relief, and no such authority has ever been created through regulation. Rather than the immediate custodian, then, the petitioners in *Accardi* and *St. Cyr* correctly sought relief from the titular head of the federal agency in charge of interpreting the immigration laws—the Attorney General.

Mr. Sanchez-Penunuri's habeas challenge is factually similar to those raised in *Accardi* and *St. Cyr*. He challenges *not* the manner in which the immigration authorities exercised discretion *but rather* their failure to exercise discretion in the first place.

---

[14] It is unclear from this Court's review of *St. Cyr* and *Accardi* whether the petitioners in those cases, who were challenging removal orders, were detained while they pursued their habeas challenges. Further, this Court is mindful that immigrants challenging removal orders fulfill the "in custody" requirement of 28 U.S.C. § 2241 as long as they are subject to a final order of deportation, regardless of whether they are detained as they proceed with their challenges. *See, e.g.*, *Aguilera v. Kirkpatrick*, 241 F.3d 1286, 1291 (10th Cir. 2001).

Further, to direct Mr. Choate, the administrator of a private prison under contract with ICE, to grant Mr. Sanchez-Penunuri's request to be considered for bond makes as little sense as directing Mr. Choate to *consider* providing him some form of discretionary relief from an order of deportation. If directed at the jailer, neither request makes practical sense.

Thus, the same question that the Supreme Court reserved in *Padilla* this Court now answers in the negative as to Mr. Sanchez-Penunuri. The immediate custodian rule does not apply to Mr. Sanchez-Penunuri's challenge to the immigration authorities' interpretation of a statute that could accord him a form of discretionary relief.[15]

### 6. Proper Respondents

This matter is further complicated by *Padilla*'s counsel that there is "generally only one proper respondent to a given prisoner's habeas petition." *Padilla*, 542 U.S. at 434. However, this Court concludes that this general rule from *Padilla* cannot apply in Mr. Sanchez-Penunuri's case and that all the original officials named by Mr. Sanchez-Penunuri are potentially the correct respondents.

#### a. Denver ICE FOD and ICE Director

First, the Denver ICE FOD could be a proper respondent because he is accorded regulatory authority to create exceptions to custody determinations that conform to ICE's interpretation of § 1226(c). As noted above, DHS regulations on noncitizen

---

[15]  Mr. Sanchez-Penunuri also raises a constitutional challenge to his detention, which does appear to be closer to the challenge raised by the petitioner in *Padilla*. Because this Court declines to reach this constitutional question, it need not resolve whether the immediate custodian rule would apply in the context of *that* type of challenge to immigration detention. *Cf. Kholyavskiy v. Achim*, 443 F.3d 946, 953 (7th Cir. 2006) (reasoning that in light of *Padilla* a constitutional challenge to immigration detention does implicate the immediate custodian rule).

detention vest power in the FOD to release from custody certain unremovable noncitizens or long-term detainees "upon such terms and conditions as *the district director* may prescribe."  8 C.F.R. § 1236.1(c)(6)(ii) (emphasis added).  Importantly, the FOD's custody decisions "shall not be subject to redetermination by an immigration judge," though they are subject to appeal to the BIA under certain circumstances.  *Id.* § 1236.1(c)(6)(iv).

The Director of ICE could also be a proper respondent.  On the one hand, this Court can find no authority suggesting this official can directly provide the relief requested here or countermand a custody decision of an ICE FOD.  On the other hand, an ICE FOD is presumably subject to some form of disciplinary procedure from a supervisor for failing to properly follow regulations, so the ICE Director could be part of the hierarchy that weighs in on a custodial determination for Mr. Sanchez-Penunuri.

At the same time, the unique circumstances of this case militate against finding either of these officials as the proper respondents.  Indeed, in all cases where the question presented turns on agency consideration of the exercise of discretion authorized by statute, the named respondent has been the titular head of the agency endowed with the power to interpret the statute.  *See St. Cyr*, 533 U.S. at 324 (discussing the "Attorney General['s]" failure to consider affording discretionary relief from deportation); *Accardi*, 347 U.S. 260 (same); *Wilbur*, 281 U.S. at 218 (1930) (naming the Secretary of the Interior as the respondent in a mandamus action directing the consideration of discretion from that agency); *cf. Armentero II*, 412 F.3d at 1096 ("If

the immediate custodian rule does not apply, then it does not apply. There is no 'next-immediate-custodian,' or 'intermediate custodian,' rule that governs in the breach.").

### b. Attorney General or DHS Secretary

Rather than the ICE FOD or the ICE Director, then, this Court concludes that either the Attorney General or DHS Secretary is the proper respondent.  This Court, however, finds it difficult to choose between these two officials.  On the one hand, there are strong arguments in support of considering the Attorney General as the proper respondent.  For example, the statute in question here dictates that "the *Attorney General* . . . may release the alien on bond of at least $1,500 with security approved by and containing conditions prescribed by, the Attorney General."  8 U.S.C. § 1226(a)(2)(A) (emphasis added).  And the question explicitly reserved in the *Padilla* footnote is "whether the *Attorney General*," not the DHS Secretary, is the proper respondent for a detained immigrant.  *Padilla*, 542 U.S. at 436 n.8.

Moreover, this case is similar to *Accardi* in that a central issue stems from the BIA's failure to exercise discretion authorized by statute.  While the rule here was imposed by the BIA, the Attorney General has broad authority to certify to himself and then review *de novo* BIA decisions, including the one that serves as the basis for Mr. Sanchez-Penunuri's detention.  *See* 8 C.F.R. § 1003.1(h).  Through this process, the Attorney General could overturn longstanding BIA precedent such as *Rojas*.  Thus, although he rarely uses this power, the Attorney General is the final arbiter of the immigration agency's interpretation of a statute, including those statutes that deal with detention.  *Cf. Bamidele v. INS*, 99 F.3d 557, 564 (3d Cir. 1996) (noting that the

Attorney General overruled a prior BIA interpretation of an immigration statute and that

the Attorney General's interpretation became the one adopted by the INS).[16]

On the other hand, there are arguments in favor of identifying the DHS Secretary

as the proper respondent.  In particular, § 1226's enactment predates the enactment of

the Department of Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135,

which transferred many matters related to immigration detention to DHS.  *See* 6 U.S.C.

§ 557; 8 C.F.R. § 236.1.  Curiously, in the aforementioned footnote reserving the

question about the application of the immediate custodian rule in the immigration

detention context, the *Padilla* Court did not account for this reality of dual control, and

instead implied that the only question to be decided was whether the "Attorney General"

is a proper respondent under these circumstances.  *Padilla*, 542 U.S. at 436 n.8.[17]

More curious still, the *Padilla* Court suggested that the *Armentero I* court had

determined that the Attorney General was the proper respondent for a habeas petition,

---

[16]  *See also Henderson v. INS*, 157 F.3d 106, 125-26 (2d Cir. 1998) (noting that the Attorney General might be a proper respondent for a habeas petition because "the extraordinary and pervasive role that the Attorney General plays in immigration matters is virtually unique" and because "the Attorney General continues to be in complete charge of the proceedings leading up to the order directing the removal of aliens from the country and has complete discretion to decide whether or not removal shall be directed" (alterations and quotation marks omitted)); Laura S. Trice, Note, *Adjudication by Fiat: The Need For Procedural Safeguards in Attorney General Review of Board of Immigration Appeals Decisions*, 85 N.Y.U. L. Rev. 1766 (2010) (reviewing the Attorney General's powers to self-certify questions to himself from the BIA and advocating for reforms to this procedure).

[17]  No doubt this was in part because, as the *Padilla* Court noted, an old Supreme Court case, *Ahrens v. Clark*, 335 U.S. 188 (1948), specifically reserved the question about whether the *Attorney General* is a proper respondent in an immigration habeas petition.  *Padilla*, 542 U.S. at 436 n.8.  Yet *Ahrens* dates from a time when the Attorney General exercised greater control over immigration functions and when the Department of Homeland Security did not exist.

when in fact *Armentero I* determined that the Attorney General *and* the DHS Secretary were proper respondents. *Compare id.*, *with Armentero I*, 340 F.3d at 1073.

In short, then, if pressed to identify only one respondent, this Court is at a loss as to whether the Attorney General or DHS Secretary should serve this function. While the Attorney General appears to be the final arbiter of who falls within the scope of § 1226(c), it is plausible that the DHS Secretary is the final authority on who is released from immigration detention.

At this time, however, this Court declines to choose between multiple possible respondents and declines to dismiss any of those who have been named, including Mr. Choate. It adheres to this position for three reasons.

First, the government has provided this Court with almost no argument for its newly articulated position that each of the originally named respondents should be dismissed. This Court is not required to decide the matter on such inadequate briefing. *See* D.C.COLO.LCivR 7.1(d).[18]

Second, this cautious approach is in accord with the reasoning of other district courts that have considered this question in the context of a challenge about the scope of 8 U.S.C. § 1226(c). These courts have either rejected the government's position or

---

[18] This principle holds special force with regard to the question of whether the DHS Secretary or the Attorney General is the proper respondent, as this Court does not know how to delineate between the competing powers of these two federal agencies. *Cf. Armentero I*, 340 F.3d at 1073 ("Until the exact parameters of the Attorney General's power to detain noncitizens under the new Homeland Security scheme are decisively delineated, we believe it makes sense for immigration habeas petitioners to name the Attorney General *in addition* to naming the DHS Secretary as respondents in their habeas petitions.").

left open the possibility of maintaining the action against someone other than the immediate custodian, including multiple additional parties.[19]

Third, this position is in accord with the Supreme Court's policy on use of the habeas writ, which prescribes maintaining broad access to the writ's protections and has "consistently rejected interpretations of the habeas corpus statute that would suffocate the writ in stifling formalisms or hobble its effectiveness with the manacles of arcane and scholastic procedural requirements."  *Hensley v. Municipal Court, San Jose Milpitas Judicial Dist., Santa Clara Cty.,* 411 U.S. 345, 350 (1973).

This Court will not allow the government's reliance on a rule that may or may not apply in this context to stifle access to the writ.  Therefore, out of an abundance of caution and mindful that this decision is almost certainly over-inclusive as to the number of respondents who should be named, this Court maintains all the above-named officials as parties.  *Accord Dunn v. U.S. Parole Comm'n*, 818 F.2d 742, 744 (10th Cir. 1987) ("So long as the petitioner names as respondent a person or entity with power to

---

[19] *See, e.g.*, *Bourguignon v. MacDonald*, 667 F. Supp. 2d 175, 180 (D. Mass. 2009) (reasoning that prior First Circuit precedent required the application of the immediate custodian rule but noting that "[t]he motion to dismiss on behalf of the [DHS] Secretary will be allowed without issuance of a final judgment, and without prejudice to reconsideration if the absence of the Secretary from this litigation creates a technical barrier to the court's remedy" of granting a habeas petition directing that petitioner be granted a bond hearing); *Johnson v. Orsino*, 12-CIV-6913-PKC, 2013 WL 1767740, at *2 (S.D.N.Y. Apr. 24, 2013) (noting that the warden of the jail where the immigrant petitioner was detained was "likely the only proper respondent in this case" but "refrain[ing] from dismissing the other respondents" absent a hearing on the matter); *Bogarin-Flores v. Napolitano*, 12-CV-0399-JAH-WMC, 2012 WL 3283287 (S.D. Cal. Aug. 10, 2012) (noting that there was no controlling authority regarding the immediate custodian rule but reasoning that "it would be counter-productive to place the responsibility of responding to the instant petition upon" the warden of the private detention facility where petitioner resided); *see also Farez-Espinoza v. Chertoff*, 600 F. Supp. 2d 488, 494 (S.D.N.Y. 2009) (naming both the Secretary of DHS and the Attorney General as respondents in a constitutional challenge to immigration detention and relying in part on Judge Berzon's dissent in *Armentero II*).

release him, there is no reason to avoid reaching the merits of his petition."); *Von Kahl v. United States*, 321 F. App'x 724, 727 n.1 (10th Cir. 2009) ("[Whoever] the proper respondent may be, the [g]overnment has filed a brief on his or her behalf.  We therefore proceed to the merits.").

In sum, then, this Court reasons that the immediate custodian rule does not apply in this case and that at least one of the respondents identified by Mr. Sanchez-Penunuri can provide him the relief he requests.  Having identified at least one correct respondent for this petition, the Court next examines and explains why Mr. Sanchez-Penunuri is entitled to habeas relief.

## B.  THE MANDATORY DETENTION PROVISION OF § 1226(c)

1.  Legal Framework

This case requires the Court to interpret the scope of an immigration detainee's right to a bond hearing, a question which is governed by 8 U.S.C. § 1226.  As is described in greater detail below, the BIA has offered one reading of the statute, which the government argues is entitled to deference under the familiar two-step framework outlined in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

The *Chevron* framework dictates as follows.  First, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842–43 (1984).  Second, if there is an ambiguity in the statutory language, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the . . . agency."  *Id.* at 844.

When considering a potentially ambiguous statute at *Chevron* Step One, this Court must determine whether a clear congressional intent exists using all of the "traditional tools of statutory construction."   *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 (1987) (quoting *Chevron*, 467 U.S. at 843 n.9).   Indeed, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."   *Id.* (quoting *Chevron,* 467 U.S. at 843 n.9) (internal quotation mark omitted)).

Further, in interpreting a statute, at *Chevron* Step One or otherwise, this Court "start[s] with its language, giving effect to its 'most natural reading.'"   *United States v. Villa*, 589 F.3d 1334, 1343 (10th Cir. 2009) (quoting *United States v. Ressam,* 553 U.S. 272 (2008) (one citation omitted)).   At the same time, the Court "'consider[s] not only the bare meaning of the [text] but also its placement and purpose in the statutory scheme,' because 'the meaning of statutory language, plain or not, depends on context.'"   *Id.* (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995) (alterations in original)).

Thus, "*Chevron* does not suggest that courts are to search statutes, overturning linguistic rocks and brush, in the hope of discovering some arguable ambiguity, which would then justify deference to an administrative construction."   *Abbott Labs. v. Young*, 920 F.2d 984, 994-95 (D.C. Cir. 1990).   Rather, "it is only when a court cannot discern an unmistakably clear expression of congressional intent that the *Chevron* inquiry

moves into its second stage." *Strickland v. Comm'r, Maine Dep't of Human Servs.*, 48 F.3d 12, 17 (1st Cir. 1995).[20]

Here, the Court's analysis stops at *Chevron* Step One. As is explained below, the plain meaning of § 1226(c) dictates that Mr. Sanchez-Penunuri does not fall within the scope of the mandatory detention provisions and is, therefore, entitled to a bond hearing in accord with § 1226(a).

2. <u>Analysis</u>

This Court begins by analyzing the language and structure of § 1226. As relevant here, the Court finds that § 1226 contains three important directives. First, subpart (a) of § 1226 provides the default rule that bond hearings apply to most noncitizens who are subject to removal proceedings, subject to certain exceptions. Second, subpart (c)(1) contains a mandate to the Attorney General to take into custody a limited class of noncitizens and creates the exemption from the default rule outlined in subpart (a). Third, subpart (c)(2) creates an exception to (c)(1)'s mandatory detention provision and governs the terms under which the noncitizens detained under subpart (c)(1) can be released. The Court reviews each of these provisions in detail before determining how they interact with each other to create a comprehensive scheme for determining an immigrant's eligibility for bond.

---

[20] The Court has borrowed some of its recitation of the standard of review from Judge William Young's helpful analysis of § 1226(c). *See Castaneda v. Souza*, No. CIV.A. 13-10874-WGY, 2013 WL 3353747, at *2-3 (D. Mass. July 3, 2013).

a)  *Subpart (a): Discretion To Set Bond*

First, § 1226(a) dictates the terms under which a bond hearing can be held.  This provision states in pertinent part:

(a) Arrest, detention, and release

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States.  *Except as provided in subsection (c) of this section and pending such decision, the Attorney General--*

(1) may continue to detain the arrested alien; and

(2) may release the alien on--

(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

(B) conditional parole; but [may not provide the alien work authorization except under specific circumstances]

8 U.S.C. § 1226(a) (emphasis added).  This portion of the statute is couched in discretionary language.  The Attorney General "may" detain a noncitizen pending a decision on the noncitizen's removability from the United States.  As this statute states, however, while such discretion exists, there is an "[e]xcept[ion]" provided in subsection (c) of the same statute.  As written, then, § 1226(a) establishes that the default rule is for the exercise of discretion in considering a bond petition, subject to an exception that is outlined in section (c).

b)  *Subpart (c)(1): Mandatory Detention*

Subsection (c)(1) of 1226 principally addresses when the exception outlined in subpart (a) applies.  This provision states in pertinent part:

(c) Detention of criminal aliens

(1) Custody

The Attorney General shall take into custody any alien who—

(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1) (footnote omitted).  This provision contains mandatory language dictating that the Attorney General "shall" take into custody individuals who are removable based on one of four different grounds listed in paragraphs (A)-(D) of § 1226(c)(1).

It is the final portion of (c)(1) that is causing all the trouble in this case.  Both parties refer to this portion as the "when . . . released" provision.  This portion of (c)(1) completes a hundred-word sentence that not even a lawyer could love.  The paraphrased version of (c)(1) reads: "The Attorney General shall take into custody any alien who—[fulfills the requirements of one of Paragraphs A-D], *when the alien is released . . . .*"

The primary dispute between the parties is how to interpret the "when . . . released" language in light of the rest of the statute.  Mr. Sanchez-Penunuri interprets "when . . . released" as imposing a temporal limitation on mandatory detention: if a noncitizen is not detained by ICE at the moment of release from state custody, the noncitizen is entitled to a bond hearing.  The government, in contrast, advances a number of arguments in support of the position that detention can be effectuated at the moment of release or at any point thereafter.

<em>c) Subpart (c)(2): Release from Mandatory Custody</em>

The second paragraph of § 1226(c) addresses another important exception to the mandatory detention provision outlined in the first paragraph of § 1226(c).  This provision reads in pertinent part:

> (2) Release
>
>> The Attorney General may release an alien described *in paragraph (1)* only if the Attorney General decides [that release is necessary for witness protection purposes or to aid in a criminal investigation and the alien is not a public safety or flight risk.]  A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

8 U.S.C. § 1226(c)(2) (emphasis added).

The two separate paragraphs of § 1226(c) serve to complement one another.  The first paragraph, (c)(1), covers a noncitizen's "custody," while the second paragraph, (c)(2), provides for his "release."  Subsection (c)(2) also cross-references subsection (c)(1) and explicitly states that those in paragraph (c)(1) are to be released "only if" certain conditions are met.  Importantly, Subsection (c)(2) does not reference any

specific part of Subsection (c)(1); rather, the paragraph broadly refers to the entirety of paragraph (1).

Further, reading the statute from start to finish, (c)(2) is properly read as what might be termed an "exception to an exception." The default rule is created in subpart (a) and instructs that the Attorney General may exercise discretion to allow for release on bond, except as provided in (c)(1). Subpart (c)(1) then identifies the scope of the exception, but then (c)(2) creates an exception to the exception identified in (c)(1).

3. *Matter of Rojas*

As discussed above, the BIA interpreted the "when . . . released" language at issue here in *Matter of Rojas*, 23 I. & N. Dec. 117 (BIA 2001). *Rojas* concerned a challenge to custody raised by Victor Leonardo Rojas, a legal permanent resident convicted of drug possession and sentenced to a term of imprisonment. Mr. Rojas had completed his prison sentence for the drug charge and had been released on parole when he was taken into ICE custody. An IJ determined Mr. Rojas was subject to mandatory detention and denied him bond. On appeal to the BIA, Rojas argued that the mandatory detention provision should be read as applying *only if* a noncitizen convicted of a qualifying crime is taken into immigration custody at the time of release from state custody. Because Mr. Rojas was not taken into custody at this time, he concluded he was entitled to a bond hearing.

The BIA rejected this position in an opinion that divided the board between an eleven-judge majority, a two-judge concurrence, and a seven-judge dissent. The majority adopted the position the government adopts in this case, concluding that "the

respondent is subject to mandatory detention . . . , despite the fact that he was not taken into [immigration] custody immediately upon his release from state custody. *Rojas*, 23 I. & N. Dec. at 127.

In reaching this conclusion, the BIA agreed in part with Mr. Sanchez-Penunuri's position here.  As the BIA noted, § 1226(c) "direct[s] the Attorney General to take custody of aliens *immediately upon their release* from criminal confinement[.]"  *Id.* at 122 (emphasis added).  In other words, although the word "when" can have multiple meanings—for example, as explained below, it can also mean "in the event that"—the definition the BIA thought applied to § 1226(c) was "immediately upon release."

At the same time, although the BIA identified no *linguistic ambiguity* in the use of the term "when," the BIA did identify a *structural ambiguity* in the way subparts (c)(1) and (c)(2) of § 1226 interacted.  As noted above, (c)(2) allows for the release of an noncitizen "described *in paragraph (1)* only if" certain conditions are met.  The BIA reasoned that the language in (c)(2) did not "unambiguously tell us whether it encompasses the 'when the alien is released' clause in . . . (c)(1) or merely references the four categories of noncitizens described in subparagraphs (A) through (D)."

In resolving this supposed ambiguity, the BIA determined that the reference to the alien "described in" (c)(1) did not "naturally appear" to include the "when . . . released" portion of this paragraph.  Having identified an apparent means to decouple the "when . . . released" language from the rest of (c)(1), the BIA proceeded to advance a number of arguments that reinforced its conclusion that the cross reference in (c)(2) to (c)(1) only encompassed paragraphs (A) through (D).

Seven judges from the BIA dissented from this view of the term "alien described in paragraph (1)." They emphasized that the statute does not present the "when . . . released" language as "some adjunct to the statute but as a component part." *Id.* at 143 (Rosenberg, J., dissenting). Indeed, the dissenters suggested that the majority's argument on the relationship between (c)(1) and (c)(2) "strain[ed] credulity," *id.* at 133, and contradicted the plain meaning of the statute, *id.* at 132.

4. The Plain Meaning of "When . . . Released"

The government submits that *Rojas* applies the proper interpretation of § 1226(c) or that the statute is ambiguous and that the *Rojas* interpretation is a reasonable one entitled to deference under *Chevron*.

This Court disagrees. Rather, it concludes that "when . . . released" as used in 1226(c)(1) plainly imposes a temporal limitation on when the mandatory detention provision should apply. This Court adheres to such a position for two reasons.

First, this Court reads the definition of the word "when" as did the BIA. "When" typically means "at the time of." And if "when" is coupled with a command, this meaning obtains further prominence: for example, if a wife tells her husband to pick up the kids *when* they finish school, implicit in this command—as many a tardy husband will know—is the expectation that the husband is waiting at the moment the event in question occurs. *See also Castaneda v. Souza*, No. 13-civ-10874-WGY, 2013 WL 3353747, at *5 (D. Mass. July 3, 2013). ("The most natural reading of 'when ... released' is the one that comports with the most common understanding of 'when.' 'When'

typically means 'at the time.'  Thus, this Court holds that the most natural reading of 'when . . . released' is 'at the time of release' or 'immediately upon release.'").

The dictionary authorities provided by the government also confirm this contextually-driven interpretation of "when," especially if the word is coupled with some sort of command.  For example, the definition of "when" from Merriam Webster's Dictionary defines "when" as "just after the moment that."  (Doc. # 11-4, at 11.)  This is the first definition of "when" as a non-interrogatory in Webster's.  Further, Webster's provides a useful example that combines this definition with a command: "please stop writing [when] the bell rings."  (*Id.*)  Similarly, the Oxford English Dictionary provides as one of its first definitions of non-interrogatory "when" as "in reference to a definite actual occurrence or fact . . . : at the time that, on the occasion that."  (Doc. # 11-4, at 4.)

Second, this Court does not see the ambiguity that the BIA perceived in the interaction between (c)(1) and (c)(2).  Indeed, this Court cannot conclude, as did the *Rojas* majority, that the phrase "aliens described in paragraph (1)" is designed to be an internal cross-reference to every part of paragraph (1) *except* the "when . . . released" clause.  To the contrary, as the *Rojas* dissenters correctly noted, the "when . . . released" language does not appear as "some adjunct to the statute but [rather] as a component part."  *Rojas*, 23 I. & N. at 143 (Rosenberg, J., dissenting).

In particular, this Court notes that the "when . . . released" language is part of the same long sentence as the rest of (c)(1) and it would be peculiar that Congress only meant (c)(2) to reference a portion of a sentence rather than the entirety of a sentence.  Further, "if the 'when the alien is released' [clause] does not describe the class of aliens

who are to be detained . . . it would doom that clause to removable surplusage."

*Castaneda*, 2013 WL 3353747, at *5.  Such a result is to be avoided, if possible, by the

alternative construction supplied by Mr. Sanchez-Penunuri.  *Id.*

The interpretation of the statute's plain meaning is sufficient to resolve the issue

before the Court.  Nevertheless, this interpretation also conforms to at least two canons

of statutory construction.  *Cf. INS v. Cardoza–Fonseca,* 480 U.S. 421 (1987) (reasoning

that when considering a potentially ambiguous statute at *Chevron* Step One, a Court

must determine whether a clear congressional intent exists using all of the "traditional

tools of statutory construction" (quoting *Chevron*, 467 U.S. at 843 n.9)).

First, it is well established that exceptions to general rules must be narrowly

construed.  *See City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731-32 (1995);

*CIR v. Clark*, 489 U.S. 726, 739 (1989) ("In construing provisions . . . in which a general

statement . . .  is qualified by an exception, we usually read the exception narrowly in

order to preserve the primary operation of the provision."); *Phillips, Inc. v. Walling*, 324

U.S. 490, 493 (1945) ("To extend an exemption to other than those plainly and

unmistakably within its terms and spirit is to abuse the interpretative process and to

frustrate the announced will of the people").

Here, this narrowing convention applies to the interaction between subparts (a)

and (c) of § 1226.  As noted above, § 1226(a) provides the default rule in favor of

allowing a bond hearing.  At the same time, the same provision provides that there is an

"except[ion]" to this rule discussed in "in subsection (c)"—an exception that this Court interprets to include a narrower category of noncitizens.[21]

Second, this reading of § 1226(c) is in keeping with the Supreme Court's "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien[.]"  *St. Cyr*, 533 U.S. at 320 (quoting *Cardoza—Fonseca*, 480 U.S. at 449); *see also* Hiroshi Motomura, *Immigration Law After A Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation*, 100 Yale L.J. 545, 568 (1990) (tracing the history of the "general interpretive rule, that courts must read ambiguous deportation statutes or regulations in the light most favorable to the alien"). This Court applies this so-called immigration rule of lenity at the first stage of the *Chevron* process to determine whether a Court must proceed to *Chevron* Step Two. *See Padash v. INS*, 358 F.3d 1161, 1173 (9th Cir. 2004).[22]  Doing so here again requires a result that favors Mr. Sanchez-Penunuri's interpretation of § 1226(c) regardless of the interpretation advanced by the BIA.

Thus, either by relying on the plain meaning of § 1226(c) or by relying additionally on canons of statutory interpretation, this Court arrives at the same result.

---

[21]  In fact, a further shortcoming of *Rojas* is its failure to take account of the interaction between Subsections (a) and (c).  Instead, *Rojas* interpreted how subsection (c)(2) interacted with (c)(1). But as was noted above, (c)(2) provides only an exception to an exception, rather than the exception to the general rule.

[22]  The Court notes that there is a lively debate both in academia and among the federal courts about the interaction of the immigration rule of lenity and *Chevron*, with different courts integrating the rule of lenity into different parts of the *Chevron* analysis.  *See* Brian G. Slocum, *The Immigration Rule of Lenity and* Chevron *Deference*, 17 Geo. Immigr. L.J. 515, 547-52 (2003).  The Tenth Circuit has recognized the potential applicability of this doctrine at both stages of the *Chevron* analysis but has declined to resolve the question based on the statute's plain meaning.  *See Khalayleh v. INS*, 287 F.3d 978, 980 (10th Cir. 2002).

"When . . . released," as used in § 1226(c), means at the time of release and does not encompass noncitizens such as Mr. Sanchez-Penunuri who were picked up at some point after the moment when they were released.

Immigration bond hearings are normally conducted pursuant to 8 U.S.C. § 1226(a), subject to the exception for those noncitizens covered under § 1226(c).  But this exception does not apply to Mr. Sanchez-Penunuri, who was detained by immigration authorities almost seven years after he was released for the last crime he committed that could trigger mandatory detention under § 1226(c).  He is therefore entitled to a bond hearing in accord with § 1226(a).

5. <u>The Government's Arguments Regarding § 1226(c)</u>

The government resists this plain reading of the statute, by advancing a surfeit of arguments pointing to alleged ambiguity in § 1226(c).  Indeed, the government seems to have left no "linguistic [or grammatical] rock" unturned "in the hope of discovering some arguable ambiguity," *Abbott Labs*, 920 F.2d at 994-95, that would allow the government to proceed to *Chevron* Step Two and a more deferential standard of review for the BIA's interpretation of § 1226(c) in *Rojas.*  None of these arguments are persuasive.  Rather, they appear as strained attempts to invent ambiguity when the meaning of § 1226(c) is plain.

a)  *Linguistic Ambiguity*

First, the government has gone to great lengths to emphasize what is beyond dispute: that "when" also means "in the event that" or "on condition that."  In light of this

alternative meaning of "when," reasons the government, the term must be ambiguous and this Court should defer to the BIA's interpretation of § 1226(c) in *Rojas*.

There are a number of problems with this argument.  First, the government's quest to find ambiguity in the definition of the word "when" is at war with the BIA's own interpretation.  As noted above, in *Rojas*, the BIA interpreted "when . . . released" to require the Attorney General "to take custody of aliens *immediately upon their release* from criminal confinement."  23 I. & N. Dec. at 122.  The ambiguity the BIA identified was *in the structure* of the statute, not in the meaning of the word "when."  Thus, the government appears to be in the uncomfortable position of *disagreeing* with the BIA about the ambiguous nature of the language employed in a statute, while at the same time asking that this Court defer to the BIA's interpretation of the same statute, which the government advocates is also "reasonable."

Second, "[a]mbiguity is a creature not of definitional possibilities but of statutory context[.]"  *Brown v. Gardner*, 513 U.S. 115, 118 (1994).  In other words, merely because a dictionary has many possible definitions for a word, it does not necessarily follow that the competing definition is the appropriate one.  By the same token, the mere existence of two definitions makes a statute neither axiomatically susceptible to competing meanings nor automatically ambiguous for purposes of *Chevron*.  Context must be coupled with dictionary definitions to determine whether the competing definitions create true ambiguity.  And, for the reasons stated above, context here dictates that "when" plainly means "at the time of release."  Thus, while it is common ground that the word "when" has multiple meanings, this fact alone does not help the

government because to arrive at the government's favored definitions requires skipping over or ignoring definitions that fit more naturally in the context of § 1226(c).

For similar reasons, the government's quest to find ambiguity in the term "when" by reference to court cases or legislative history also fails.  First, contrary to the government's suggestion, there is no tension between Mr. Sanchez-Penunuri's interpretation of § 1226(c) and *United States v. Willings*, 8 U.S. 48 (1807).  In language quoted by the government, the *Willings* Court did note that it "cannot be controverted" that "when" has multiple meanings.  *Id.* at 55.  However, in language the government chose not to reference from the same passage in *Willings*, the Court continued "of course, the *context* must decide in which sense it is used in the law under consideration."  *Id.* (emphasis added).  Thus, *Willings* further supports this Court's reasoning that "when," *as read in context*, must impose a temporal limitation.

Second, the government notes that the Ninth Circuit in *Lagandaon v. Ashcroft*, 383 F.3d 983, 988 (9th Cir. 2004), "examined the meaning of 'when' in an immigration statute and cited multiple dictionaries that define 'when' as meaning both 'immediately' and 'while.'" (Doc. # 11, at 9.)  The government, however, fails to note that the Ninth Circuit provided these lists to establish a very different proposition: that "when" does not mean "prior to."  *Lagandaon*, 383 F.3d at 988.  Thus, as relevant here, *Lagandoan* merely reiterates the uncontroversial point that dictionaries provide multiple definitions of the term "when."

Finally, this Court hardly knows what to make of the government's reliance on the use of the word "whenever" in a conference committee report in the bill that ultimately

was used to enact § 1226(c).  (Doc. # 11, at 10.)  To be clear, § 1226(c) itself uses the

word "when" and not "whenever," and, in light of the plain meaning of the statute, this

Court refuses to read anything further into a word referenced in a committee report that

was omitted from final draft of a piece of legislation.  *Cf. United States v. Woods*, No.

12-562, -- S. Ct. -- 2013 WL 6231156, at *9 n.5 (Dec. 3, 2013) ("Whether or not

legislative history is ever relevant, it need not be consulted when, as here, the statutory

text is unambiguous.").[23]

*b)  Structural Issues in § 1226(c)*

The government also presses the argument that proved a winning one at the BIA

in *Rojas*: namely, that this court should decouple the "when . . . released" language from

the rest of § 1226(c)(1).  (Doc. # 11, at 8.)  This Court has already rejected this

argument, for the reasons stated above.

A variation on this argument is the government's position that, if you move the

"when . . . released" phrase so that it is directly in front of Paragraphs A-D, then this

new construction somehow supports the government's favored interpretation.  (*Id.* at 12-

13.)  In other words, the government proffers that it makes all the difference that §

1226(c) could also read "[t]he Attorney General shall take into custody *when . . .*

*released* any alien who [fulfills the requirements of one of Paragraphs A-D]."

_____

[23]  Both parties proffer that when could mean "a reasonable period of time after his release from custody."" (Doc. # 1; Doc. # 11, at 11)   The government further suggests that this formulation would avoid what the *Rojas* majority recognized as an "analytical problem[]" of determining whether mandatory detention would apply to criminal aliens with gaps of "1 minute, 1 hour, or 1 day" between criminal and immigration custody (Doc. # 11, at 11 (quoting *Rojas*, 23 I. & N. Dec. at 124)).   But if Congress had meant the mandatory detention provision to be triggered after a "reasonable amount of time" it could have so stated in the statute. Further, the "analytical problem" suggested by the government does not exist here, in light of the seven years that have elapsed between Mr. Sanchez-Penunuri's release from custody and his detention by immigration authorities.

Leaving aside for a moment the fact that Congress did not adopt this arrangement of § 1226(c), this Court does not see how this construction yields any different result for Mr. Sanchez-Penunuri because nothing about this new positioning changes what this Court views as the most appropriate definition of the word "when" to apply in this case.  Rather, this reinterpretation merely moves the temporal limitation that triggers ineligibility for a bond hearing from the end of the statute to the beginning.[24]

### c)  Legislative Purpose

Next, the government argues that its interpretation of § 1226(c) is in keeping with "Congress's intention to remove executive discretion over bond determinations for criminal aliens."  (Doc. # 6, at 13-14.)  The government broadly argues that Congress's "dual intentions" for § 1226(c) were "to keep dangerous aliens off the streets" and to prevent them from absconding during removal proceedings.  (*Id.* at 14 (quoting *Sylvain v. Attorney Gen. of U.S.*, 714 F.3d 150, 160 (3d Cir. 2013).)

This view of Congress's intent ignores the nuanced scheme that Congress in fact set up in Paragraphs A-D of § 1226(c).  As noted above, these paragraphs cover a noncitizen who:

> (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>
> (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

---

[24]  The Court also notes that the government cites a number of old authorities in support of this argument—authorities which were not provided as exhibits accompanying the government's briefing.  The Court is therefore at a disadvantage in fully understanding the government's argument here.

> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

> (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

8 U.S.C. § 1226(c).  These individuals are identified through cross-references to 8 U.S.C. § 1182, which governs inadmissibility of noncitizens, and 8 U.S.C. § 1227, which governs the deportability of noncitizens.  *Cf. Reyes v. Holder*, 714 F.3d 731, 732 (2d Cir. 2013) (per curium) (providing a detailed analysis of how different criminal acts could trigger inadmissibility or deportability for noncitizen and noting that the deportability provision, § 1227, only applies to immigrants "legally admitted to the United States").

Paragraphs (A) and (D) of § 1226(c)(1) address the mandatory custody grounds for those who are *inadmissible*.  In particular, Paragraph (A) references 8 U.S.C. § 1182(a)(2), a statute which bars, with certain exceptions, the admission of noncitizens who have committed a drug crime or a "crime involving moral turpitude."  Meanwhile, Paragraph (D) references 8 U.S.C. § 1182(a)(3)(B), which covers, *inter alia*, noncitizens who have engaged in terrorism-related offenses and activities.  Paragraph (D) also references § 1227(a)(4)(B), which refers back to the definition provided in § 1182(a)(3)(B) and establishes that this category of noncitizen is deportable (in addition to being inadmissible).

Paragraphs (B) and (C) of § 1226(c)(1) address when mandatory detention applies to those who are *deportable*.  Both of these paragraphs reference 8 U.S.C. § 1227(a)(2), which provides an extensive list of crimes triggering deportability.

Paragraph (B) references five separate provisions in § 1227: in particular, the § 1227 provisions address any noncitizen who has committed: (1) "*two or more* crimes involving moral turpitude," § 1227(a)(2)(A)(ii) (emphasis added); (2) "an aggravated felony," § 1227(a)(2)(A)(iii); (3) a crime relating to a controlled substance (with certain exceptions), § 1227(a)(2)(B); (4) certain firearms offenses, § 1227(a)(2)(C); or (5) crimes that threaten national security, such as treason, espionage, and sedition, § 1227(a)(2)(D).

Significantly, although Paragraph (B) mandates detention for noncitizens who have committed "two or more" crimes involving moral turpitude (CIMTs), it explicitly *excludes* those who have committed only one CIMT.  Instead, Paragraph (C) covers *some* of the noncitizens who have committed only one CIMT, by referencing § 1227(a)(2)(A)(i), which in turn identifies as deportable any noncitizen who is "convicted of a crime involving moral turpitude" within a specified time period "and . . . is convicted of a crime for which a sentence of one year or longer may be imposed."

In other words, not every noncitizen subject to deportation for committing one CIMT is subject to mandatory detention under § 1226(c)(1).  Rather, Paragraph (C) of § 1226(c)(1) modifies the terms under which mandatory detention applies to this class of noncitizen by dictating that mandatory detention applies only for those who have both committed one CIMT and have "been sentence[d] to a term of imprisonment of at least 1 year."

This Court draws three important conclusions from Congress's careful drafting of Paragraphs (A)-(D).  First, just because a noncitizen has committed a crime, it does not necessarily follow that he is either deportable or subject to mandatory detention.

Rather, a noncitizen must have committed a crime triggering these specific

consequences for such considerations to come into play.

Second, Congress wrote a broader rule on mandatory detention for those subject

to removal for being *inadmissible* and a narrower one for those who are *deportable*:

Paragraph (A) broadly sweeps in all *inadmissible* noncitizens who have committed even

one CIMT, while Paragraphs (B) and (C) provide more targeted grounds for mandatory

detention for those who are now subject to deportation after having been lawfully

admitted.

Third, the interplay between Paragraphs (B) and (C) reflects not only Congress's

decision to differentiate between classes of *deportable* noncitizen criminals, but also its

decision to use mandatory detention only for those convicted of more serious offenses.

On the one hand, noncitizens who have committed one aggravated felony, two or more

CIMTs, or one serious CIMT is subject to mandatory detention.  On the other hand, a

noncitizen who has committed only one less serious CIMT—for example, a noncitizen

imprisoned for eight months for a CIMT that carries a maximum statutory penalty of one

year's imprisonment—is *not* subject to mandatory detention, even though he may be

subject to deportation.

Thus, contrary to the government's blanket assertion, § 1226(c) does not evince

Congressional intent to remove executive discretion over bond determinations for all

noncitizens convicted of criminal offenses.  Rather, the complex scheme created by

Congress *distinguishes* between different categories of these noncitizens: some are

deportable (or inadmissible) and subject to mandatory detention, some are deportable

(or inadmissible) but *not* subject to mandatory detention, and some incur no immigration consequences as a result of having committed a crime.  *See also Saysana v. Gillen*, 590 F.3d 7, 17 (1st Cir. 2009) ("[§ 1226(c)] does not reflect a general policy in favor of detention; instead, it outlines specific, serious circumstances under which the ordinary procedures for release on bond at the discretion of the immigration judge should not apply.").

Relatedly, the government is on shaky ground in raising the specter of "dangerous aliens" being returned to the streets as a result of Mr. Sanchez-Penunuri's proffered interpretation of § 1226(c).  (Doc. # 11, at 13.)  The government never takes account of the fact that noncitizens of the "dangerous" sort will not qualify for bond. Indeed, the government appears to forget that the remedy here is *not* release, but access to a hearing that might yield release.

### d)  The Duty to Act and the Loss of Authority

Finally, the government relies on cases establishing that, absent contrary evidence, statutes which impose deadlines on the government's exercise of authority do not strip the government of its authority to act when it misses those deadlines.  *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003); *United States v. Montalvo-Murillo*, 495 U.S. 711, 717-18 (1990); *Brock v. Pierce Cnty.*, 476 U.S. 253, 264 (1986); *United States v. Dolan*, 571 F.3d 1022, 1023 (10th Cir. 2009), *aff'd*, 560 U.S. 605 (2010).

This Court finds persuasive Judge Raymond Moore's analysis of this argument in *Baquera v. Longshore*, 2013 WL 2423178, at *6-7.  As Judge Moore reasoned, cases

such as *Montalvo-Murillo* and *Dolan* dealt with "laws containing a time sensitive directive to government officials in the context of a statute that was silent as to the consequence of a failure to adhere to the time requirements established by Congress." *Id.* at *7.  Further, in contrast to the instant statute, "[n]either statute [in those cases] contained language suggesting an outcome in the event that the court failed to discharge its obligations in a timely manner.  In other words, the statutes contained directives surrounded by relative silence as to the consequence should the deadline not be met." *Id.*  "Faced with this," reasoned Judge Moore, "both the Supreme Court and the Tenth Circuit were reluctant to create a coercive sanction, especially one which penalized the public by causing the loss of a valuable right created by Congress—the right to have dangerous criminals detained in the case of the Bail Reform Act and the right to restitution under the Mandatory Victims Restitution Act." *Id.*

In contrast to the statutes at issue in cases such as *Dolan* and *Montalvo-Murillo*, § 1226 "is structurally different," because if § 1226(c) does not apply then the statute reverts back to subpart (a) of the same statute.  Thus, as Judge Moore concluded, "[t]here is no judicially created sanction—coercive or otherwise—necessary to entitle Mr. Nieto to a bond hearing."  And "whatever appropriate reticence there is to the creation of judicial overlays on congressional language is simply not at issue in this matter." *Id.*  Thus, again, in light of Judge Moore's analysis, the Court is not persuaded by the government's argument.

### III. CONCLUSION

It is for these reasons that this Court grants Mr. Sanchez-Penunuri's petition for a writ of habeas corpus (Doc. # 1).  The Respondents shall provide Mr. Castillo with an individualized bond hearing pursuant to 8 U.S.C § 1226(a) within 14 days of the date of the entry of this Order.

DATED:  December 31, 2013

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge